# EXHIBIT A

INTEGRITY COAL SALES, INCORPORATED
Claimant

v.

A & G COAL CORPORATION, et al
Respondents

JAMS Ref. #1425004474

PARTIAL FINAL AWARD

## PARTIES AND BACKGROUND FACTS

The parties to this dispute are Integrity Coal Sales, Incorporated

(Integrity), a   buyer and exporter of metallurgical grade coal, and A&G

Coal Corporation (A&G),[1]  which at all relevant times mined and sold

metallurgical grade coal.

Integrity Coal Sales, Incorporated is represented by Thomas Farrell

and Tauron Brown of McGuire Woods LLP in Houston, Texas. A&G

Coal Corporation is represented by Francis Casola and Nicholas Albu of

---

[1]The parties have stipulated that the obligations of Meg-Lynn Land
Company, also a named party to these proceedings and the signatory to
Purchase Order 10774, have been assumed by A&G, and both
companies are hereinafter referred to as A&G.

1

Woods Rogers PLC in Roanoke, Virginia and by Elsey Harris of

Mullins, Harris and Jessee in Norton, Virginia.

Two Purchase Orders executed by authorized representatives of the

parties are involved in this dispute.    Under both Purchase Orders

Integrity agreed to buy, and A&G agreed to sell, metallurgical grade

coal.    The obligations of the parties with respect thereto form the basis

for this dispute.

The relationship of the parties began with a test order in late 2006,

which presented no problems.    Thereafter, Purchase Order 10774

("10774") was entered into on December 28, 2006 and revised on

January 19, 2007.    It provided for the purchase of 120,000 tons of

metallurgical grade coal (with defined specifications) at a price of

$62-$64 per ton, depending on ash content.    Its stated Schedule was

January-December 2007.

Purchase Order 10906 ("10906") was entered into on September

24, 2007, several months prior to the end of the stated Schedule of

2

10774.   As of that date, Integrity had purchased only about 46,000

tons of coal pursuant to 10774.   10906 provided for the purchase

of 100,000 tons of metallurgical grade coal (with defined specifications)

at a higher price of $70 per ton.   Its stated Schedule was January

2008-December 2008, but immediately below the Schedule the

following asterisked language appears:

This P.O. commences immediately or upon the completion

of the prior P.O. which is Purchase Order No. 10774 dated

December 28, 2006.

Some payments under 10774 were late, but A&G did not complain about

late payments until early 2008, when A&G's outside CPA, Freddie

Dean, got involved.   Resolution of late payments was achieved early in

2008.   Shortly thereafter, on February 20, 2008, A&G's President, Jerry

Wharton ("Wharton"), wrote a letter to Integrity which referenced

"Termination and Breach of Contract",   listed order details and

payments and accused Integrity of violating the terms of all purchase

3

orders since May 8, 2007 by late payments.   The letter further stated

that 10774 terminated on December 31, 2007 and A&G owed no further

coal under it.   The letter did not mention 10906 and concluded:

> Since January 2008 we have failed to receive payment in a
>
> timely fashion for any shipped coal.   We cannot do business
>
> with brokers unable to pay pursuant to the terms of their
>
> purchase orders.   Should you wish to discuss this matter,
>
> please call me.

Integrity continued to place orders for coal, which were not honored.

On September 5, 2008,   Wharton again wrote to Integrity, referencing

"Termination and Breach of Contract" and his February 20, 2008 letter,

and stating, in part:

> You have failed to discuss this matter or attempted any
>
> resolution of your continued inability to pay your bills when
>
> due....There has been no change in your status, and we will not
>
> honor requests for coal shipments from you.   Pursuant to

4

Paragraph II of your Purchase Order, this refusal to commence

delivery constitutes rejection of your terms.

This arbitration proceeding followed soon after, pursuant to Paragraph

XIII of the General Terms and Conditions which appear on the back of

10774 and 10906 and are an essential part thereof.   Paragraph XIII

prescribed New York law as governing and   required binding arbitration

of any dispute or controversy arising from or relating to the parties to the

Purchase Orders.

A 3-day evidentiary hearing was conducted before the Arbitrator

on February 8-10, 2012.   Thereafter, post-hearing briefs and reply briefs

were provided by counsel.   The last brief was received on April 17,

2012 and the hearing was closed on that date.   By agreement on May

16, 2012, the time for the rendition of the Award was extended to May

29, 2012.

5

## CLAIMS ASSERTED BY THE PARTIES

Integrity seeks damages for breach of contract arising from A&G's refusal to sell coal under 10774 and 10906.   A&G seeks damages for breach of contract arising from Integrity's failure to purchase 120,000 tons of coal under 10774.

## INTEGRITY'S CLAIM FOR DAMAGES FOR BREACH OF 10774

By the end of 2007, Integrity had not received $56,326.50^{2}$ tons of the 120,000 tons specified in 10774.   That shortfall is the basis for Integrity's claim for damages for breach of 10774.   Integrity argues that it was entitled to order and receive coal after December 31, 2007, which was not a firm termination date of 10774, for several reasons.

First, Integrity relies on Paragraph VII of the General Terms and Conditions, which gives a buyer an option to accept or reject late shipments.   Integrity argues that Paragraph VII, in conjunction with the

---

[2]The parties agree that certain January 2008 shipments should be included in this total and treated as shipments under 10774.

6

Schedule on the front of 10774, contemplates that deliveries may extend beyond December 31, 2007.   That argument might have force if the circumstances were that A&G made late deliveries, but that is not the case.   The shortfall is mostly (though not entirely) attributable to Integrity's failure to place orders for 120,000 tons during the Schedule period.   Under those circumstances, reliance on Paragraph VII of the General Terms and Conditions is misplaced.

Next, Integrity argues that there was an understanding between it and A&G which was memorialized in the asterisked language quoted above.   The understanding was that any coal covered by 10774 that was not delivered in 2007 could be ordered and would be delivered in 2008. The testimony of Robert Edouard ("Edouard"), Integrity's Operations Manager, who alone negotiated for Integrity, supports this understanding.   Specifically, he testified that in September of 2007 he had discussions with Darrell Grigsby ("Grigsby"), who alone negotiated for A&G.   After   Edouard and Grigsby discussed the then-existing

7

2007 shortfall of 74,000 tons, with orders of only 16,000 tons forecast for the balance of 2007, it was agreed that the remaining 2007 tons could be ordered and shipped in the beginning of 2008 under 10774 and that the "new contract wasn't supposed to commence until after we obtained all the tonnage from the old contract." Tr. @ 293-296 . This was important to Integrity because the new contract [10906] was at a higher price ($70 per ton) and Integrity "wanted to make sure that we got all the coal on the old contract, which was a lower price contract." This was discussed with Grigsby and he agreed. Tr. @ 298. Integrity argues that the asterisked language in 10906 memorialized that agreement.

A&G argues strenuously that Integrity's pleadings preclude such an argument because the pleadings were limited to a *force majeure* position as to the extension of 10774. The Arbitrator is of the view that Integrity's position was fairly noted by its pleadings and and certainly by its briefing. Its First Amended Notice of Claim alleges at ¶¶ 30-31:

8

A&G expressly agreed that coal delivered to Integrity would be priced under the lower price of Purchase Order No. 10774 (even if delivered in 2008) until a total of 120,000 tons had been delivered to Integrity under Purchase Order No. 10774.   Under this arrangement, the higher price set forth in Purchase Order No. 10906 would not become operative until A&G had "made up" in 2008 all deliveries under Purchase Order No. 10774 that had been deferred from 2007.

To document this agreement, the following language was added to Purchase Order No. 10906: "This P.O. commences immediately or upon the completion of the prior P.O. which is Purchase Order No. 10774 dated December 28, 2006.

The evidence and arguments presented by Integrity are well within the scope of this pleading.

With respect to the discussions about 10774 in September 2007, Grigsby denied that there was an express agreement to extend the 10774

9

Purchase Order into 2008, but admitted that a new contract, at a higher

price, was discussed and executed in September of 2007.   Tr. @ 732.

Because Grigsby testified that he had no recollection of the discussions

or negotiation of the asterisked language in 10906, his testimony on this

subject is not very helpful.   Nonetheless, in his direct testimony he

professed an understanding of the asterisked language that is not

significantly different than Mr. Edouard's understanding:

>     Q Did you have any expectation what the term was for [10906]?
>
>       ...When it would begin and when it would end?
>
>     A The way I took it, it would begin once the other one was
>
>       complete.   If we completed the other one sooner, good, we

get

>       to this price quicker.   But the other one, once it was

completed

>       we go to the next one.

Tr. @ 735.   Grigsby then testified (Tr. @ 735) that he had no

10

"expectation that [10774] was going to extend beyond December of 2007". That testimony is not credible, at the very least because there would be no need for the agreed asterisked language if the parties had understood that performance of 10774 had to be completed in 2007. Moreover, the very context of his discussions with Edouard in September of 2007 was the likelihood that Integrity would not be able to order 120,000 tons by December 31, 2007. Finally, A&G's owner, Wharton admitted that, while it was "doable", it would have been "tough to do", and agreed that "physically to deliver that much in a three-month period, even if you had it and Integrity wanted it, would have been a real stretch, because you're at the mercy of the railroad" and the railroad did not favor sending its cars to smaller sidings like A&G's Cane Patch siding. Tr. @ 578-579. The Arbitrator concludes that both Grigsby and Wharton expected that performance of 10774 would extend into 2008, and agreed thereto

The Arbitrator is convinced that the appropriate interpretation of

11

the asterisked language, given the language and the circumstances and content of its negotiation, is that 10906 would become operative, with its higher price, "immediately", i.e., even before its stated date of January 1, 2008 if, and only if, Integrity's performance of 10774 was completed before that date.   Both parties realized that that would be highly unlikely, so they also agreed that 10906 would commence upon the completion of 10774, which both parties expected would be in 2008.

A&G argues that the oral agreement between Edouard and Grigsby is ineffective because Paragraph XIV of the General Terms and Conditions requires a writing to amend 10774 and that the asterisked language in 10906 is not such a writing.   Certainly there is no writing referring in so many words to the oral agreement, described above, to extend the performance of 10774 into 2008.   However, 10906 is a writing, signed by both parties, and   Integrity argues that its asterisked language is sufficient memorialization of the oral agreement.

The intention of the parties to create successive contracts is clear

12

and is memorialized in writing, by virtue of the asterisked language in 10906 which expressly refers to 10774 and to delaying the start of 10906 until completion of 10774.   From this written expression it necessarily follows that 10774's performance may be extended into 2008, because it necessarily immediately precedes the delayed start of 10906.   Nothing more is required to satisfy the writing requirement of Paragraph XIV of the General Terms and Conditions.   The salutary purpose of requiring an amendment or modification to be in writing (to prevent fraud) is not served when both parties agree on the essential terms of the modification, as noted above.

A&G also argues that Integrity should not be permitted to offer evidence of any alleged agreement to extend 10774's stated term or defer all remaining tonnage into 2008, as such evidence would contradict the asterisked language in 10906, a fully integrated agreement.   Reply Brief @ 21.   The Arbitrator disagrees.   Integrity's arguments and evidence do not contradict the asterisked language; they rely on it to support their

13

argument that tonnage promised by A&G under 10774 should have been provided in 2008.

WAS THERE A BREACH OF 10774?

New York law determines whether Wharton's February 20, 2008 letter was a breach of 10774. The New York UCC's over-arching requirement of good faith in commercial transactions suggests that a party to a contract cannot take action inconsistent with that contract. In this connection, several months earlier, in September of 2007, the parties had reached an accommodation, and a new contract, which dealt with Integrity's failures to order coal. Nonetheless, the February 20, 2008 letter completely ignores the agreement between Grigsby and Edouard, memorialized in 10906, when it asserts that 10774 "terminated on December 31, 2007, and we do not owe you any further coal under it" and relies on past failures to order coal. The thrust of the agreement of the parties was of course that Integrity was still entitled to order and get coal under 10774 in February of 2008. One wonders whether

14

Wharton knew what Grigsby had negotiated on behalf of A&G.

As to the late payments, several facts appear.   A&G paid no attention to this situation, which it alleges persisted since May of 2007, and therefore never complained to Integrity, until January of 2008. Wharton testified that it would not have been   the lateness of the payments that concerned A&G; the only concern was that it would not get paid at all.   Therefore, Integrity's late payments could not have constituted a substantial impairment of 10774's benefit to A&G. During the 14-month course of the relationship between A&G and Integrity, A&G was paid for every ton of coal supplied, and of course A&G never demanded assurance of performance under the New York UCC.   In any event, Wharton's stated concern about ultimate non-payment could no longer exist as of the date of the February 20. 2008 letter, because Integrity's account was brought up to date by February 11, 2008.   Wharton's statements about past concern about

15

past breaches (if they occurred) which have already been cured do not paint a picture of genuine concern over the status of the business relationship with Integrity.

The Arbitrator concludes that A&G's purported termination of 10774 was a breach of that contract. Integrity argues that it was also pretextual, because the well-documented rising market price for coal as of February of 2008 made it advantageous for A&G to sell its abundant coal elsewhere at higher prices than $62-$64 per ton and that this was the real motivation for the breach. There is strong circumstantial support for this argument, given A&G's failure to even recognize its agreement to sell coal under 10774 after December 31, 2008 (or under 10906) and the paid-up status of Integrity's account before February 20, 2008. However, this ample evidence of breach of contract renders it unnecessary to decide what A&G's motivation was.

WAS THERE A BREACH OF 10906?

As to 10906, A&G's main defense to liability under 10906 is that

16

it never became effective.   A&G argues that completion of 10774 was
a condition precedent to the inception of 10906, and 10774 was never
completed.   It is significant that A&G, in its February 20, 2008 letter,
never mentioned 10906 or its present position that it was a nullity
because it never came into effect.   A&G terminated 10774 unilaterally
on February 20, 2008, without good reason, and that termination does
not support its bootstrap   argument that therefore 10906 never came
into existence.   A&G cannot win that argument by relying on its own
unwarranted breach of 10774.   A&G and Integrity were parties to a
contract (10906) whose performance would begin sometime in the
future, i.e., an executory contract.   By its unwarranted preclusion of the
happening of the event which would start the 10906 clock running
(completion of 10774), A&G prevented that clock from starting.   So
even if there were a condition precedent in play, A&G cannot, by its
unilateral breach of contract, prevent its occurrence.   Therefore, A&G's
argument that 10906 never came into existence is rejected.   It came into

17

existence on September 24, 2007, but its performance was not yet due.

A&G also argues that Integrity's late payments and failures to order under 10774 constitute defaults under 10906, which preclude 10906's enforcement by Integrity against A&G.   Nothing in either Purchase Order suggests such a relationship between them.

Accordingly, the Arbitrator concludes that A&G breached 10906.

WHEN DID A&G BREACH 10906, AND WHEN DID INTEGRITY LEARN OF IT?

Wharton testified that his intent in sending the February 20, 2008 letter was to end the entire relationship with Integrity, but that letter is certainly ambiguous at best as to that intent.   A&G argues that A&G's actions with respect to 10906 were clearly an anticipatory breach thereof.   The Arbitrator credits Wharton's statement of his subjective intent as of February 20, 2008 to have no further dealings with Integrity with respect to 10774 and 10906.   However, this case is unusual, because for reasons discussed below Integrity did not learn of the

18

breach of 10906 for some time.

The parties disagree as to the applicable legal standard to apply in calculating damages for breach of contract under the circumstances present here.   The Arbitrator is of the view that, to calculate damages under 10906, it must be determined when Integrity "learned of the breach." [3] This is an issue of major significance to damages in this case, and the parties and their witnesses have discussed it extensively. Integrity's position is that it did not learn of the breach of 10906 until long after the February 20, 2008 letter, in part because that letter did not mention 10906 and in part because it continued to place orders and was never advised that they would be rejected because the entire relationship

---

[3]The same is true as to 10774, but Integrity learned of its breach when it received the February 20, 2008 letter from Wharton stating that "we do not owe you any more coal" under 10774.

19

was over.   Gregory Licata ("Licata"), Integrity's owner, testified that

he felt from the February 20, 1008 letter that Integrity would not receive

any more coal from A&G, but also testified that he was referring only to

10774, because the letter did not mention 10906.   He stated that he

expected that Integrity would receive coal under 10906 and instructed

Edouard to keep ordering coal for several months.   Edouard did so and

Grigsby responded with lies about A&G's non-existent supply

problems, rather than communicating Wharton's alleged position that

the entire relationship was over.   In any event, Wharton's alleged

position that the entire relationship was over as of February 20, 2008

(thus supporting an argument that Integrity learned of the breach at that

time) is belied by the language of the February 20, 2008 letter itself.   It

concludes, "Should you wish to discuss this matter, please call me."

Objectively, such language is an invitation to negotiate further, rather

than a cut-off of a business relationship.   However, the letter arguably

contradicts itself when it stated that A&G was "unable to do business"

20

with Integrity.   Licata, for his part, knew from the letter that a call to Wharton was necessary to resolve their differences, but chose not to do so, thereby suggesting that he understood that the relationship with A&G was over.   As can be seen, it is very difficult to find any consistency among the words of the letter, the actions of the parties and their stated intentions and understandings.   Accordingly, the Arbitrator will rely on the actual communications between the parties to decide when Integrity "learned of the breach."   There were no such communications between Wharton and Licata, but there were several between Grigsby and Edouard.   As noted, Edouard continued requesting shipments after the February 20, 2008 letter, and Grigsby responded with lies about non-existent supply problems.   Thus, as long as Grigsby was telling Edouard that A&G's supply problems precluded shipments, rather than telling him the truth   (that he was under orders not to ship to Integrity), Edouard and Integrity did not know that A&G had chosen to breach 10906.   The lies stopped on June 4 and June 30,

21

2008, when Grigsby's emails merely referred Edouard to the February

20, 2008 letter, but as noted above that letter did not even mention

10906 and left the door open for discussions which could lead to the

repair of the relationship.   By emails dated July 31, 2008 and

September 4, 2008, Edouard continued to request deliveries for load

dates of August 19 and September 17.   The record does not reflect a

response from Grigsby to these emails, but on September 5, 2008

Wharton wrote to Integrity and stated that "Our companies are not

accepting orders from you" and that "...we will not honor requests for

coal shipments from you."[4]   This was the first and only straighforward

statement from A&G to Integrity relating to 10906, and clearly notified

Integrity that A&G would not comply with 10906.   Because the

Arbitrator has rejected A&G's argument that the non-occurrence of a

condition precedent prevented 10906 from going into effect, A&G

---

[4]The September 5, 2008 letter concluded, "Pursuant to Paragraph II
of your Purchase Order, this refusal to commence delivery constitutes
rejection of your terms."   That is ineffective where, as here, A&G has
already consented to Integrity's terms and a contract has been formed.

22

breached 10906 and Integrity learned of it on September 5, 2008.

A&G'S COUNTERCLAIM

The Arbitrator now turns to A&G's counterclaim.   A&G
contends that Integrity breached 10774 by not ordering 120,000 tons
before 10774's term ended on December 31, 2007.   At the hearing,
A&G presented evidence that purported to show that Integrity was
buying similar coal elsewhere in 2007 at a lower price, thus explaining
its low ordering from A&G and supporting A&G's claim for breach of
10774.   Integrity responded to this evidence with a credible showing
that coal purchased elsewhere was not similar, and that the lower prices
it paid were justified by quality differences between that coal and
A&G's coal.   On cross-examination, Grigsby was unable to refute this
showing.   Therefore, Integrity's purchases from other suppliers do not
support A&G's breach of contract claim.   That claim is in any event
defeated by the Arbitrator's conclusion that there was an agreement that
orders and shipments under 10774 could extend until March 31, 2008,

23

which agreement was breached by A&G.   To prevail on a breach of

contract claim, a party must show that it did not itself breach the

contract, and A&G cannot show this.   Had A&G permitted 10774 to

run its course, and had Integrity's orders continued at the same meager

pace, A&G's claim for breach of contract might have had some merit.

DAMAGES

Integrity seeks damages under UCC §2-713 consisting of "the

difference between the market price at the time when the buyer learned

of the breach and the contract price..."   As discussed above (fn 3),

Integrity learned of the breach of 10774 on February 20, 2008 and

learned of the breach of 10906 on September 5, 2008.   These are the

dates when Integrity learned of A&G's repudiation of 10774 and 10906,

respectively.   The parties debate whether this is the correct

interpretation of UCC §2-713, but even the commentator advocating a

different interpretation admits that this is its "plain meaning" and the

majority rule.   White & Summers, *Uniform Commercial Code*, §6-7, at

24

pages 434-435.   The Arbitrator is convinced that New York would

follow the plain meaning approach.   Accordingly, the market prices on

February 20, 2008 and September 5, 2008 must be ascertained.

The market price for comparable coal on February 20, 2008 is in

dispute.   There is no "exchange" for coal which supplies a daily market

price for a given quality of coal.   The best evidence in the record

ranges from the $80 spot price paid to A&G by Integrity on January 24,

2008 to a Purchase Order from Integrity to Alliance Coal for slightly

inferior coal at $130 on February 28, 2008.   In the absence of any

better tool for calculating the market price on February 20, 2008, the

Arbitrator will use a straight-line interpolation and divide the difference

between $80 and $130 ($50) by the number of days between January 24

and February 28 (35) to arrive at a per-day increase of $1.43.   Over the

27 days between January 24 and February 20, an increase of $38.58

would have taken place ($1.43 x 27).   Thus, this method results in a

market price on February 20, 2008 of $118.58.   Integrity's damages for

25

Case 1:12-cv-05293-ALC   Document 2-1   Filed 07/09/12   Page 27 of 30


breach of 10774 are thus $3,074,300.30    ($118.58 market price minus

$64 contract price times 56,326.50 tons).

The market price for comparable coal on September 5, 2008 is not

in dispute, though A&G argues vigorously but unsuccessfully that

September 5, 2008 is not the appropriate date for measuring the market.

The evidence as to the market price on September 5, 2008 consists of

an Integrity Purchase Order from Alliance Coal for slightly inferior coal

at $250 per ton on September 3, 2008.   The damages calculation for

breach of 10906 is therefore $250 market price minus $70 contract price

times 100,000 tons.   The result is that Integrity is entitled to damages in

the amount of $18,000,000 for breach of 10906.[5]

The Arbitrator recognizes that the damages A&G must pay with

respect to 10906 are very large, but established rules of law and the

unusual facts compel this result.   Because A&G chose not to tell the

---

[5]The Arbitrator notes that Integrity has requested a slightly smaller
amount (Opening Post-Hearing Brief @ 50-51) but does not share
Integrity's reasoning.

26

truth to Integrity during the period that coal prices increased

dramatically, it bore the risk of rising market prices.

Accordingly, Integrity Coal Sales, Inc. is entitled to damages from

A&G Coal Company and Meg-Lynn Land Company, Inc. in the total

amount of $21,074,300.30.

Integrity also seeks to recover its attorneys' fees and expenses

incurred in prosecuting this proceeding (First Amended Notice of Claim

@ page 14).   Paragraph VIII of the General Terms and Conditions of

the Purchase Orders provides in part: IN THE EVENT LEGAL

PROCEEDINGS OR ARBITRATION IS INITIATED BY BUYER, IT

SHALL BE ENTITLED TO RECOVER FROM SELLER ALL

COURT COSTS, REASONABLE ATTORNEY'S FEES AND ANY

EXPENSES INCURRED BY BUYER INCIDENT TO SUCH

PROCEEDINGS.   This issue was reserved (Tr. @ 97), so the parties

have not addressed it.   After it is addressed and resolved, the Arbitrator

will issue a Final Award.

27

Integrity also seeks to recover its attorneys' fees and expenses incurred in prosecuting this proceeding (First Amended Notice of Claim @ page 14). Paragraph VIII of the General Terms and Conditions of the Purchase Orders provides in part: IN THE EVENT LEGAL PROCEEDINGS OR ARBITRATION IS INITIATED BY BUYER, IT SHALL BE ENTITLED TO RECOVER FROM SELLER ALL COURT COSTS, REASONABLE ATTORNEY'S FEES AND ANY EXPENSES INCURRED BY BUYER INCIDENT TO SUCH PROCEEDINGS. This issue was reserved (Tr. @ 97), so the parties have not addressed it. After it is addressed and resolved, the Arbitrator will issue a Final Award.

May 29, 2012

John C. Lifland, USDJ-retired
Arbitrator

28

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Integrity Coal Sales, Incorporated vs. A&G Coal Corporation, et al.
Reference No. 1425004474

      I, JOSEPH C. EDMONDS, not a party to the within action, hereby declare that on June 1, 2012 I
served the attached PARTIAL FINAL AWARD (29 MAY 2012) on the parties in the within action by Email
and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the
United States Mail, at New York, NEW YORK, addressed as follows:

Francis H. Casola Esq.                          Elsey A Harris III Esq.
Woods Rogers PC                                 Mullins, Thomason, Harras
10 South Jefferson Street, Suite 1400           The Law Building
P.O. Box 14125                                  30 Seventh Street, PO Box 1200
Roanoke, VA  24011                              Norton, VA  24273
Tel: 540-983-7716                               Tel: 276-679-3110
Email: casola@woodsrogers.com                   Email: eharris@mhjpc.com
    Parties Represented:                            Parties Represented:
    A&G Coal Corporation                            A&G Coal Corporation
    Meglyn Land Company                             Meglyn Land Company

Thomas M. Farrell Esq.
McGuire Woods LLP
600 Travis St.
Suite 7500
Houston, TX  77002
Tel: 713-571-9191
Email: tfarrell@mcguirewoods.com
    Parties Represented:
    Integrity Coal Sales, Incorporated

      I declare under penalty of perjury the foregoing to be true and correct. Executed at New York,
NEW YORK on June 1, 2012.

JOSEPH C. EDMONDS
JEDMONDS@JAMSADR.COM